UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES MCCUISTON                           CIVIL ACTION

VERSUS                                    NO: 07-426

COASTAL CATERING, LLC., TETRA             SECTION: R(3)
APPLIED TECHNOLOGIES, LP AND
SOUTHERN STATES BROKERAGE,
INC.

## ORDER AND REASONS

Before the Court is Defendant Coastal Catering, L.L.C.'s motion for summary judgment. For the following reasons, Coastal's motion is GRANTED.

## I.    BACKGROUND

## A.    McCuiston's Injuries

James McCuiston worked as a cook/galley hand for Coastal aboard the Tetra Rig 27, a vessel allegedly owned by Southern States Brokerage, Inc. and operated by Tetra Applied Technologies, L.P. (*See* R. Docs. 1, 36.) On or about June 14,

2006, McCuiston allegedly fell as he tried to descend from an unbolted ladder leaning against his third-tier bunk. (R. Doc. 89, Ex. I at 60:15-21.) He claims to have sustained injuries to his neck, back and knee. (R. Doc. 1, 36.) Two days later, McCuiston allegedly tripped and fell on the deck of the OC264, a vessel also allegedly owned by Southern and operated by Tetra, as he was being removed from the Tetra Rig 27 in order to receive medical attention. (*See* R. Docs. 31, 36.) McCuiston again allegedly suffered injuries to his neck, back, and knee, including aggravation of his prior injuries. (*See* R. Docs. 1, 36.)

After returning to shore on June 16, 2006, McCuiston was seen by Dr. Robert Davis, Coastal's physician. (R. Doc. 89, Ex. B.) Davis observed that McCuiston was limping slightly and diagnosed a left knee abrasion, a left thumb abrasion and low back pain. (*Id.*) Davis cleaned the knee abrasion, administered a tetanus shot and Neosporin, prescribed over-the-counter Aleve, and cleared McCuiston for regular duty. (*Id.*) McCuiston consulted Davis again on June 20, 2006 concerning pain and swelling in his left knee and lower back discomfort. (*Id.*) Davis diagnosed moderate degenerative changes in McCuiston's lumbar spine, low back pain, and left knee cellulitis. (*Id.*) Davis prescribed 100mg of Doxycycline (an antiboitic) twice per

day for ten days and 10mg of Toradol (a nonsteroidal anti-inflammatory) three times per day for pain. (*Id.*) MRIs were also ordered. (*Id.*) McCuiston was cleared for sedentary work. (*Id.*)

**B.    Settlement**

On June 23, 2006, McCuiston and Coastal entered into a seaman's release of claims agreement. (*Id.*, Ex. J.) McCuiston agreed to release any and all claims against Coastal and Tetra for consideration of $2,000. (*Id.* ¶ 5.) Before the agreement was executed, it was read into a sworn record at a settlement conference. (*Id.*, Ex. K.) McCuiston was not represented by counsel at the conference. (*Id.* at 12:5-10.) McCuiston stated, however, that he previously contacted an attorney, that he understood he was free to hire or consult with an attorney, and that he chose to settle without the advice of counsel. (*Id.* at 12:11-16.) McCuiston understood that if he hired an attorney and filed a claim in court to go to trial, he "could get more or less money or [he] could get no money." (*Id.* at 13:1-6.) He also stated that he was "willing to complete this settlement to avoid any prospect of litigation." (*Id.* at 13:7-10.) McCuiston understood that he had potential claims for maintenance and cure, pain and suffering damages, economic losses, and medical

expenses, and that Coastal contested these claims. (*Id.* at 8:14-9:17.)

McCuiston acknowledged that he was releasing "any and all past, present or future claims arising from the accidents and service," including claims for "damages, compensation, pain and suffering, wrongful termination, discrimination, medical expenses, maintenance, cure, past or future wages, past or future loss of wage earning capacity, loss of consortium, punitive damages, claims for insurance coverage or other fringe benefits . . . ." (*Id.* at 10:14-25.) McCuiston understood that "basically" he was releasing Coastal from "any future liability." (*Id.* at 11:13-16.) He also understood that he was giving up "all rights" against Coastal "even if these conditions [he was] claiming get worse in the future." (*Id.* at 12:17-21.) McCuiston acknowledged that he would "be fully and solely respons[able] for . . . all past medical expenses [and] all future medical expenses . . . ." (*Id.* at 15:1-5.) He also recognized that Coastal would "not be paying for any future medical expenses" (*id.* at 19:21-25), and that if he had "medical expenses from these injuries that [he was] claiming from these accidents, [he had] to pay those" (*id.* at 20:1-4). McCuiston understood that "once this is done, [he was] not going to be entitled to any money for any reason in the future" from Coastal. (*Id.* at 18:10-14.)

4

Lastly, McCuiston indicated that he was "not under the influence of medication, narcotics or alcohol." (*Id.* at 17:21-24.) He stated that he understood the settlement agreement, had a "sound mind," and was not under duress or made to settle the case. (*Id.* at 17:25-18:7.) He also stated that he was entering into the settlement agreement because he wanted to. (*Id.* at 18:8.)

Notwithstanding his sworn statements that he was not under the influence of medication, the following exchange took place during the deposition of Dr. Robert Davis on April 9, 2008:

**[Attorney for defendants]:** Anything else that you did with Mr. McCuiston that day?

**[Dr. Robert Davis]:** Well, we cleaned and bandaged the abrasion sites and --

**[McCuiston]:** Don't forget to mention the oxycodone and the drugs you gave me, and the guy with the tetanus shot. I don't know what it was, but that knocked me out, man.

**[Dr. Robert Davis]:** There is no oxycodone that was given to you, sir. Anti-inflammatories were given, and a tetanus shot was given.

**[Attorney for defendants]:** I was going to ask you about a tetanus shot.

**[McCuiston]:** (Inaudible) – sir. It knocked me off my feet. I ended up in a wheelchair outdoors with this panic lock button.

**[Attorney for defendants]:** Doctor, as you can appreciate from Mr. McCuiston's ongoing interruptions, he claims that the injection you gave him somehow affected his ability to

understand his circumstances.  Can a tetanus shot do that?

**[Dr. Robert Davis]**: No sir.

**[McCuiston]**: If it wasn't a tetanus shot, sir, I think you gave me something else.

**[Dr. Robert Davis]**: Well, tetanus shot is the only thing that was given to you, sir.

**[Attorney for defendants]**: Specifically, Mr. McCuiston claims that seven days later, on June 23rd, when he agreed to settle his claim, his judgment was impaired because of the injection he received a week earlier.  Is that possible?

**[McCuiston]**: Injection and the medication, I don't know, three or four different types medication, oxycodone and some other stuff, terribly impaired me.

**\* \* \***
**[Attorney for defendants]**: Dr. Davis, would any of the medication that you gave to Mr. McCuiston have impaired his ability to understand proceedings a week later?

**[Dr. Robert Davis]**: No, sir, they would not.

(Id., Ex. H at 24:6-26:20)


C.    **Prior Medical History**

When McCuiston applied for employment with Coastal on May

16, 2006, he indicated that he did not suffer from any prior back

or knee injuries.  (*Id.*, Ex. A.)  McCuiston also denied prior

back or knee injuries at his pre-employment physical examination

with Dr. Robert Davis on May 16, 2006.  (*Id.*, Ex. B.)  Based on

this information, Dr. Robert Davis cleared McCuiston for

employment without restrictions.  (*Id.*)

It appears from medical records at the Veterans Affairs Medical Center in Memphis, Tennessee, however, that McCuiston did in fact suffer from prior back, leg and knee injuries.  On April 5, 2005, McCuiston was prescribed a straight cane after complaining of pain and weakness in his right leg.  (*Id.*, Ex. C.) McCuiston told an emergency department nurse that his "right leg gave out" and that this problem had occurred several times in the past.  (*Id.*)  On February 28, 2006, McCuiston told his primary care physician that he had pain, tingling and numbness radiating down both legs, and that his legs had given way.  (*Id.*, Ex. D.) He also stated that he suffered from knee pain.  (*Id.*)  On or around March 1, 2006, McCuiston wrote a letter to his physician inquiring why his back and both legs "have suddenly given out and stopped working."  (*Id.*)  The staff physician indicated that McCuiston "has been having trouble with his back and legs for some time."  (*Id.*)  On March 20, 2006, McCuiston sought an evaluation of his knee and back pain.  (*Id.*, Ex. E.)  His primary care physician also diagnosed chronic lower back pain and recommended an MRI.  (*Id.*)  A subsequent MRI revealed degenerative disc disease.  (*Id.*, Ex. F.)  On April 28, 2006, McCuiston was measured for an osteoarthritis knee brace.  (*Id.*, Ex. G.)  On May 5, 2006, McCuiston consulted a therapist about

atrophy of his right thigh muscles. (*Id.*) McCuiston stated that
he had been in a full-leg cast for six or seven months after
jumping from the roof of a house in 1990, and that he has had
problems with his leg ever since. (*Id.*) He also indicated that
his back was affected by a car accident in the 1960s. (*Id.*)
Costal's physician, Dr. Robert Davis, stated at his deposition
that "[m]ore than likely, I would not have approved [McCuiston]"
for work if he had disclosed his prior medical history. (*Id.*,
Ex. H at 37:6-14.)


**D.  McCuiston's Claims**

McCuiston asserts claims of maritime negligence against
Southern, Tetra and Coastal. (*See* R. Docs. 1, 36.) He also
seeks maintenance and cure from Coastal. (*Id.*) McCuiston has
been represented by two different counsel in this action, but
both have withdrawn. (*See* R. Docs. 50, 82.) On August 19, 2009,
a show cause hearing was held at which McCuiston indicated that
he was proceeding *pro se*. (*See* R. Doc. 85.) Coastal moved for
summary judgment on October 27, 2009, asserting that McCuiston's
claims must fail because he:  (a) already settled his claims with
Coastal; (b) intentionally concealed medical information
concerning his pre-existing injuries; (c) cannot demonstrate that
his injuries on the Tetra Rig 27 and OC264 caused his injuries;

and (d) cannot demonstrate that Coastal had notice of the
defective conditions.  (R. Doc. 89.)  McCuiston has filed a two
page, *pro se* opposition without exhibits or affidavits.  (R. Doc.
90.)  A final pre-trial conference is set for January 7, 2010,
and a jury trial is set for January 19, 2010.  (R. Doc. 74.)  The
Court need address only the first of Coastal's grounds for
summary judgment.


## II.  STANDARD

Summary judgment is appropriate when "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317,
322-23 (1986).  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075
(5th Cir. 1994).  When assessing whether a dispute as to any
material fact exists, the Court considers "all of the evidence in
the record but refrains from making credibility determinations or
weighing the evidence."  *Delta & Pine Land Co. v. Nationwide
Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All
reasonable inferences are drawn in favor of the nonmoving party,
but "unsupported allegations or affidavits setting forth
'ultimate or conclusory facts and conclusions of law' are

insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See,*

10

*e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

## III. DISCUSSION

### A.    Enforcement a Seaman's Release of Claims

Seamen are the wards of admiralty law, and federal courts are duty-bound to jealously protect their rights. *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1160-61 (5th Cir. 1985) (citing *Garrett v. Moore-McCormack Co.*, 317 U.S. 239 (1942)). The Court is therefore "particularly vigilant" to guard against overreaching in settlement agreements with seamen. *Id.* at 1161. The proponent of a seaman's release of claims has the burden to demonstrate that it was "executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." *Garrett*, 317 U.S. at 352. This burden is often more difficult when the release is based on inadequate consideration. *Id.* The burden is not insurmountable, however, and a "district court lacks authority, especially where the seaman testifies to complete satisfaction, to void the agreement because the court thinks the seaman could have negotiated a better deal." *Bass*, 749 F.2d at 1162.

The adequacy of consideration is relevant to the Court's

appraisal of whether the seaman had a full understanding of his
rights and of the consequences of the settlement agreement. *See
Garrett*, 317 U.S. at 248. Similarly, the Court may consider the
nature of the medical and legal advice available to the seaman in
determining whether he fully understood the agreement. *Garrett*,
317 U.S. at 248. If a medical condition has been incorrectly
diagnosed at the time of settlement, that mutual mistake may be a
basis for invalidating a seaman's release of claims. *See
Robertson v. Douglas S.S. Co.*, 510 F.2d 829, 835 (5th Cir. 1975);
*see also In re Cardinal Servs. Inc.*, 304 F. App'x 247, 254 (5th
Cir. 2008) (*per curiam*). On the other hand, a seaman "may have
to take his chances" that a properly diagnosed condition is "more
serious and extensive than originally thought." *Robertson*, 510
F.2d at 835; *see also Durley v. Offshore Drilling Co.*, 288 F.
App'x 188, 191 (5th Cir. 2008). Lastly, the Court is sensitive
to whether the parties negotiated at arms-length and in good
faith, and whether there is any appearance of fraud, deception,
coercion or overreaching. *Borne v. A & P Boat Rentals No. 4,
Inc.*, 780 F.2d 1254, 1256-57 (5th Cir. 1986).

**B. Application**

Because Coastal bears the ultimate burden of demonstrating
the validity of McCuiston's release of claims, Coastal must come
forward with evidence that would entitle it to a directed verdict

if the evidence went uncontroverted at trial. *Int'l Shortstop*, 939 F.2d at 1263-64. It has done so. The record indicates that McCuiston entered into the settlement agreement freely and without deception or coercion. McCuiston affirmed under oath that he was not under duress, that nobody was making him settle his claims, and that he was doing so because he wanted to. He also indicated that he was not under the influence of medication, narcotics or alcohol, and that he was of sound mind. McCuiston was informed that he was free to hire or consult with an attorney, and that he could potentially get more money if he hired an attorney and filed a claim in court. McCuiston stated that he had consulted an attorney at one point, but he chose not to hire the attorney and instead settle without counsel. McCuiston indicated that he was willing to complete the settlement in order to avoid any prospect of litigation.

Furthermore, the record indicates that McCuiston understood his rights and that Coastal was forthright about the implications of the release. McCuiston acknowledged that he had potential claims for maintenance and cure, pain and suffering damages, economic losses and medical expenses, and that Coastal contested these claims. McCuiston also acknowledged that the practical implication of the settlement agreement was to release Coastal from any and all future liability arising from the accidents, and

that he would not be entitled to any money for any reason once the settlement was completed. McCuiston was told that he was giving up all of his rights even if his medical conditions grew worse in the future.

Because Coastal has satisfied its burden at summary judgement, McCuiston must come forward with sufficient evidence that the release is invalid, or else show that Coastal's evidence could not persuade a reasonable fact-finder. *Int'l Shortstop*, 939 F.2d at 1265. The Court has already found that Coastal's evidence could persuade a reasonable fact-finder, and McCuiston has not come forward with any evidence at all, or even responded to Coastal's arguments about the release of claims. On the record before the Court, McCuiston could at most point to his interjections during the deposition of Dr. Robert Davis to raise a possibility that his faculties were affected by medication at the time he executed the release of claims. But these statements are insufficient to send this case to a jury, even for a *pro se* litigant. First, they are unsworn and directly contradict McCuiston's contemporaneous sworn testimony that he was not under the influence of medication at the time he executed the release of claims. In any event, McCuiston has offered no basis for a reasonable jury to conclude that the types and amounts of medications he was allegedly taking could impair his mental

faculties.  There is no competent evidence that McCuiston was
ever prescribed oxycodone.  McCuiston's statements during the
deposition of Dr. Robert Davis focus on his condition after
receiving a tetanus shot on June 16, 2009.  It appears that the
only other medication offered to McCuiston on June 16, 2006 was
over-the-counter Aleve.  Although McCuiston was prescribed
Toradol (an anti-inflammatory) on June 20, 2006, Coastal's
physician, Dr. Robert Davis, testified that the tetanus shot and
anti-inflammatory would not have impaired his judgment or ability
to understand the settlement agreement.  McCuiston has not
presented any evidence contradicting this conclusion, and his
unsworn interjections during a third-party deposition are
insufficient.

The Court recognizes that $2,000 is a relatively small sum.
The amount is not, however, so low that the Court must conclude
on the facts of this case that McCuiston lacked a complete
understanding of his rights.  First, it does not appear from the
record that McCuiston was seriously injured from his accidents.
There is no evidence that McCuiston was hospitalized or even
prevented from seeking other work.  McCuiston himself testified
that his injuries were "resolved," that he was "no longer in need
of medical treatment and that any disability [he] may have in the
future or any disability [he] may have right now stems from

15

medical problems not related to the incidents of June 14th, 15th or 16th . . . ." (R. Doc. 89, Ex. K at 8:3-13.) Second, it is uncontradicted that McCuiston failed to disclose prior back and leg injuries when applying for employment with Coastal, that these were the same areas he allegedly re-injured, and that Coastal would not have hired him had it known of this medical history. Accordingly, Coastal likely had a meritorious defense to his maintenance and cure claim. *See, e.g.*, *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 174 (5th Cir. 2005); *McCorpen v. Central Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968). Third, although Coastal hired McCuiston as a cook/galley hand, there is no evidence that Coastal operated the Tetra Rig 27 or the OC264. In response to Coastal's motion for summary judgment on liability, McCuiston provided no evidence that Coastal was negligent with respect to the conditions on those vessels. This casts doubt on the value of McCuiston's negligence claims against Coastal.

The Court's conclusions are fully supported by case law. In *Bass*, a seaman suffered severe injuries when a forty-pound jack handle fell eighty feet and struck him on the head. 749 F.2d at 1156. The seaman settled his claims against his employer effectively for $32,000. 749 F.2d at 1156 n.3. The Fifth Circuit found that the seaman executed his release of claims

freely and knowingly and with a full understanding of his rights because (a) the agreement included warnings that the release of claims was complete; (b) the seaman testified that the provisions of the settlement were fully explained to him and that he willingly executed the agreement without reservation; and (c) the seaman did not allege that he executed the agreement with an imperfect understanding of his rights or the consequences of settlement. *Id.* at 1163. All three of these conditions hold in this case. Although the seaman in *Bass* was represented by counsel, nothing in *Bass* indicates that representation is a prerequisite for a valid release of claims.

In *Durden v. Exxon Corp.*, the Fifth Circuit upheld an unrepresented seaman's release of claims. 803 F.2d 845 (5th Cir. 1986). In *Durden*, a seaman injured his shoulder when he slipped and fell over the side of a grain barge. *Id.* at 847. He underwent three operations as a result of the fall and eventually settled his claims against his employer for $87,000 without the advice of counsel. *Id.* The Fifth Circuit held that the seaman's allegations that he was not advised by counsel and was depressed were insufficient to undermine the district court's conclusion that he fully understood his rights and the consequences of his actions. *Id.* at 488. The court observed that the seaman was informed by the defendant's attorney that he was entitled to

retain his own counsel, and that the seaman did not claim that he was coerced or deceived into settling his claims. *Id*. As in *Durden*, McCuiston does not claim that he was coerced or deceived into settling his claims, and he was informed by Coastal's attorneys that he was entitled to retain counsel. In fact, McCuiston did consult an attorney before executing the release of claims, but he chose to settle with Coastal instead of hiring the attorney.

The Fifth Circuit's decision in *Halliburton v. Ocean Drilling & Explor. Co.* does not help McCuiston. 620 F.2d 444 (5th Cir. 1980) (*per curiam*). *Halliburton* found a genuine issue of material fact as to the validity of a seaman's release of claims because the record revealed that the seaman had been on a course of therapy requiring Phenaphen, Valium and Dalmane. *Id*. The seaman's physician submitted an affidavit stating that the drugs, when taken together, "have a potentiating, or greatly increased effect upon the patients' mental faculties, which the drugs, if ingested alone, would not have." *Id*. The physician also testified that a patient who had taken these drugs "would more than likely have impaired or diminished mental capacity . . . and certainly this would include the ability to understand, assess and fully appreciate the terms, results, and effects of a release of any claim involving the patient." *Id. Halliburton* is

distinguishable because McCuiston has submitted no competent evidence that his medications affected his judgment at the time of the settlement agreement. As already discussed, McCuiston's comments during the deposition of Dr. Robert Davis are insufficient, and therefore McCuiston may not avoid his release of claims on grounds of incapacity.

Lastly, McCuiston is not helped by the decisions in *Durley v. Offshore Drilling*. In *Durley*, a seaman was injured on an oil rig and diagnosed with severe bruising. *Durley v. Offshore Drilling*, 288 F. App'x at 189. The seaman then executed a release of claims for consideration of $3,000 without the assistance of counsel. The agreement, explained on the record, provided that the seaman released all claims that "may hereafter accrue to him, whether known or unknown, foreseen or unforeseen." *Id.* The agreement also stated that the seaman was fully aware that his condition could grow worse. *Id.* After executing the release, the seaman was diagnosed with torn ligaments in his knee and a herniated disc in his cervical spine. The Fifth Circuit reversed the district court's finding that the agreement was the product of mutual mistake. *Id.* at 190. Although the post-settlement medical diagnosis differed from prior diagnoses, this did not indicate mutual mistake because the seaman testified that he knew at the time he signed the release that he had injuries to

his knee and neck. *Id.* The Fifth Circuit remanded, however, for a determination of whether the seaman's allegations of economic duress, insufficient consideration, and lack of counsel warranted invalidating the release. *Id.* at 191-92. On remand, the district court invalidated the release on grounds that $3,000 was inadequate consideration for the seaman's serious knee and back injuries; the seaman was not represented by counsel during negotiations; and the defendants were aware of and took advantage of the seaman's serious financial troubles. *See Durley v. Offshore drilling Co.*, Civ. A. No. 06-5681, 2009 WL 799977, at *2 (E.D. La. Mar. 24, 2009). In this case, it appears that McCuiston's injuries are similar in kind to his undisclosed, preexisting injuries, and there is no indication that McCuiston has been diagnosed with entirely new injuries. Moreover, there is no indication in the record before the Court that McCuiston was subject to knowing and intentional economic duress. Accordingly, McCuiston may not avoid his release of claims on grounds of mutual mistake or duress.

**IV. CONCLUSION**

For the reasons stated, Coastal's motion for summary judgment is GRANTED.

New Orleans, Louisiana, this 28th day of December 2009

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE