UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES MCCUISTON                          CIVIL ACTION

VERSUS                                   NO: 07-426

COASTAL CATERING, LLC., TETRA            SECTION: R(3)
APPLIED TECHNOLOGIES, LP AND
SOUTHERN STATES BROKERAGE,
INC.

## ORDER AND REASONS

Before the Court is defendants Tetra Applied Technologies, LP's and Southern States Offshore, Inc. (Southern)'s motion to dismiss for lack of prosecution (R. Doc. 94) and motion for summary judgment (R. Doc. 97). For the following reasons, defendants' motion for summary judgment is GRANTED.

## I.   BACKGROUND

## A.   McCuiston's Injuries

James McCuiston was allegedly injured while working as a cook/galley hand aboard the Tetra Rig 27, a vessel bareboat

chartered by Southern and operated by Tetra. (*See* R. Doc. 97, Exs 2, 3.) Southern also contracted with Coastal to provide galley hands and utility hands. (*See id.*, Ex. 4.) McCuiston was employed by Coastal, and Coastal assigned McCuiston to work aboard the Tetra Rig 27.

On or about June 14, 2006, McCuiston allegedly fell as he tried to descend from an unbolted ladder leaning against his third-tier bunk. (R. Doc. 89, Ex. I at 60:15-21.) He claims to have sustained injuries to his neck, back and knee. (R. Doc. 1, 36.) Two days later, McCuiston allegedly tripped and fell on the deck of the OC264, a vessel also allegedly chartered by Southern and operated by Tetra, as he was leaving the Tetra Rig 27 in order to receive medical attention. (*See* R. Docs. 31, 36.) McCuiston again allegedly suffered injuries to his neck, back, and knee, including aggravation of his prior injuries. (*See* R. Docs. 1, 36.)


**B.    Settlement**

On June 23, 2006, McCuiston entered into a seaman's release of claims agreement for consideration of $2,000. (R. Doc. 89, Ex. J.) The agreement releases any and all claims against Coastal, Tetra and their principal contractors. (*Id.* ¶¶ 5, 6.) The agreement acknowledges that McCuiston's potential claims

2

include claims for damages, compensation, pain and suffering, wrongful termination, discrimination, medical expenses, maintenance, cure, past or future wages, past or future loss of wage earning capacity, loss of consortium, punitive damages, claims for insurance coverage or other fringe benefits, and any other causes of action." (*Id.* ¶ 6.) In plain language, the agreement recognizes that McCuiston "will never again be able to recover money" from Coastal, Tetra or their principal contractors. (*Id.* ¶ 13.) The agreement recognizes that McCuiston could recover more or less money at trial, but states that he was willing to complete the agreement in order to avoid the uncertainties and expenses of litigation. (*Id.* ¶ 7.)

Before McCuiston's release of claims was executed, it was read and explained into a sworn record at a settlement conference. (R. Doc. 89, Ex. K.) McCuiston was not represented by counsel at the conference. (*Id.* at 12:5-10.) McCuiston stated, however, that he previously contacted an attorney, that he understood he was free to hire or consult with an attorney, and that he chose to settle without the advice of counsel. (*Id.* at 12:11-16.) McCuiston understood that if he hired an attorney and filed a claim in court to go to trial, he "could get more or less money or [he] could get no money." (*Id.* at 13:1-6.) He also stated that he was "willing to complete this settlement to

avoid any prospect of litigation." (*Id.* at 13:7-10.) McCuiston understood that he had potential claims for, *inter alia*, maintenance and cure, pain and suffering damages, economic losses, and medical expenses. (*Id.* at 10:8-11:17.)

McCuiston acknowledged that he was releasing "any and all past, present or future claims arising from the accidents and service," including claims for "damages, compensation, pain and suffering, wrongful termination, discrimination, medical expenses, maintenance, cure, past or future wages, past or future loss of wage earning capacity, loss of consortium, punitive damages, claims for insurance coverage or other fringe benefits . . . ." (*Id.* at 10:14-25.) McCuiston understood that "basically" he was releasing "any future liability." (*Id.* at 11:13-16.) He also understood that he was giving up "all rights . . . even if these conditions . . . get worse in the future." (*Id.* at 12:17-21.) McCuiston acknowledged that he would "be fully and solely respons[able] for . . . all past medical expenses [and] all future medical expenses . . . ." (*Id.* at 15:1-5.) He also recognized that the released parties would "not be paying for any future medical expenses" (*id.* at 19:21-25), and that if he had "medical expenses from these injuries that [he was] claiming from these accidents, [he had] to pay those" (*id.* at 20:1-4). McCuiston understood that "once this is done, [he was] not going

4

to be entitled to any money for any reason in the future." (*Id.* at 18:10-14.)

Lastly, McCuiston indicated that he was "not under the influence of medication, narcotics or alcohol." (*Id.* at 17:21-24.) He stated that he understood the settlement agreement, had a "sound mind," and was not under duress or made to settle the case. (*Id.* at 17:25-18:7.) He also stated that he was entering into the settlement agreement because he wanted to. (*Id.* at 18:8.)

Notwithstanding his sworn statements that he was not under the influence of medication, the following exchange took place during the deposition of Dr. Robert Davis on April 9, 2008:

**[Attorney]:** Anything else that you did with Mr. McCuiston that day?

**[Dr. Robert Davis]:** Well, we cleaned and bandaged the abrasion sites and --

**[McCuiston]:** Don't forget to mention the oxycodone and the drugs you gave me, and the guy with the tetanus shot. I don't know what it was, but that knocked me out, man.

**[Dr. Robert Davis]:** There is no oxycodone that was given to you, sir. Anti-inflammatories were given, and a tetanus shot was given.

**[Attorney]:** I was going to ask you about a tetanus shot.

**[McCuiston]:** (Inaudible) – sir. It knocked me off my feet. I ended up in a wheelchair outdoors with this panic lock button.

**[Attorney]**: Doctor, as you can appreciate from Mr. McCuiston's ongoing interruptions, he claims that the injection you gave him somehow affected his ability to understand his circumstances. Can a tetanus shot do that?

**[Dr. Robert Davis]**: No sir.

**[McCuiston]**: If it wasn't a tetanus shot, sir, I think you gave me something else.

**[Dr. Robert Davis]**: Well, tetanus shot is the only thing that was given to you, sir.

**[Attorney]**: Specifically, Mr. McCuiston claims that seven days later, on June 23rd, when he agreed to settle his claim, his judgment was impaired because of the injection he received a week earlier. Is that possible?

**[McCuiston]**: Injection and the medication, I don't know, three or four different types medication, oxycodone and some other stuff, terribly impaired me.

* * *

**[Attorney]**: Dr. Davis, would any of the medication that you gave to Mr. McCuiston have impaired his ability to understand proceedings a week later?

**[Dr. Robert Davis]**: No, sir, they would not.

(R. Doc. 89, Ex. H at 24:6-26:20).


C.   **Prior Medical History**

It appears from the record that McCuiston suffered from existing back, leg and knee injuries at the time of the accidents at issue in this case. On April 5, 2005, McCuiston was prescribed a straight cane after complaining of pain and weakness in his right leg. (R. Doc. 89, Ex. C.) McCuiston told an

emergency department nurse that his "right leg gave out" and that this problem had occurred several times in the past. (*Id.*)  On February 28, 2006, McCuiston told his primary care physician that he had pain, tingling and numbness radiating down both legs, and that his legs had given way.  (R. Doc. 89, Ex. D.)  He also stated that he suffered from knee pain.  (*Id.*)  On or around March 1, 2006, McCuiston wrote a letter to his physician inquiring why his back and both legs "have suddenly given out and stopped working."  (*Id.*)  The staff physician indicated that McCuiston "has been having trouble with his back and legs for some time."  (*Id.*)  On March 20, 2006, McCuiston sought an evaluation of his knee and back pain.  (R. Doc. 89, Ex. E.)  His primary care physician also diagnosed chronic lower back pain and recommended an MRI.  (*Id.*)  A subsequent MRI revealed degenerative disc disease.  (R. Doc. 89, Ex. F.)  On April 28, 2006, McCuiston was measured for an osteoarthritis knee brace. (R. Doc. 89, Ex. G.)  On May 5, 2006, McCuiston consulted a therapist about atrophy of his right thigh muscles.  (*Id.*) McCuiston stated that he had been in a full-leg cast for six or seven months after jumping from the roof of a house in 1990, and that he has had problems with his leg ever since.  (*Id.*)  He also indicated that his back was affected by a car accident in the 1960s.  (*Id.*)  Costal's physician, Dr. Robert Davis, stated at

his deposition that "[m]ore than likely, I would not have approved [McCuiston]" for work if he had disclosed his prior medical history. (*Id.*, Ex. H at 37:6-14.)

## D.    This Action

Notwithstanding his release of claims, McCuiston brought this action against Coastal, Chevron Corporation and Exxon-Mobil Corporation on January 19, 2007.[1]  He filed a first amended complaint on May 1, 2007 asserting claims against Tetra (*see* R. Doc. 13), and a second amended complaint on July 25, 2007 asserting claims against Southern (*see* R. Doc. 36).  McCuiston has been represented by two different counsel in this action, but both have withdrawn.  (*See* R. Docs. 50, 82.)  On August 19, 2009, a show cause hearing was held at which McCuiston indicated that he was proceeding *pro se*.  (*See* R. Doc. 85.)  Since that time, McCuiston has been somewhat absent from this litigation.  In opposition to Coastal's motion for summary judgment, McCuiston filed a two page memorandum that did not address the merits of Coastal's arguments and did not include exhibits or affidavits. (*See* R. Doc. 90.)  The Court granted Coastal's motion for summary

---

[1]    Chevron was voluntarily dismissed from the action on May 30, 2007.  (R. Doc. 19.)  Exxon was voluntarily dismissed on July 23, 2007.  (R. Doc. 34.)

judgment on December 28, 2009. (R. Doc. 91.) McCuiston has also failed to comply with various provisions of the Court's pre-trial scheduling order. (*See* R. Doc. 74.) It does not appear that McCuiston contacted Magistrate Judge Knowles for the purpose of scheduling a settlement conference within two weeks of the January 7, 2010 pretrial conference. McCuiston did not attend the pretrial conference held on January 7, 2010. (*See* R. Doc. 93.) And McCuiston did not submit a proposed pretrial order. (*Id.*)

McCuiston asserts claims of unseaworthiness and Jones Act negligence against Tetra and Southern. (*See* R. Docs. 1, 13, 36.) Tetra and Southern have moved to dismiss McCuiston's claims for failure to prosecute (R. Doc. 94), and they have also moved for summary judgment on grounds that McCuiston has released his claims (R. Doc. 97). McCuiston has not responded to these motions, and his opposition to Coastal's motion for summary judgment is of no help.

**II. STANDARD**

**A. Failure to Prosecute**

The Court may involuntarily dismiss an action, with prejudice, if the plaintiff fails to prosecute or comply with the Federal Rules of Civil Procedure or a court order. Fed. R. Civ.

9

P. 41(b).  This authority is based on the Court's power to manage
and administer its own affairs to ensure the orderly and
expeditions disposition of cases.  *Berry v. Cigna/RSI-Cigna*, 975
F.2d 1188, 1190-91 (5th Cir. 1992).  A dismissal with prejudice
is an extreme sanction, however, and the Court's discretion is
limited.  *Id.; see also Silas v. Sears, Roebuck & Co., Inc.*, 586
F.2d 382, 385 (5th Cir. 1978).  The Fifth Circuit has held that
dismissal with prejudice for failure to prosecute should be
granted only when "(1) there is a clear record of delay or
contumacious conduct by the plaintiff, and (2) the district court
has expressly determined that lesser sanctions would not prompt
diligent prosecution, or the record shows that the district court
employed lesser sanctions that proved to be futile."  *Berry*, 975
F.2d at 1191.  In addition, at least one of three aggravating
factors is typically found before a case is dismissed with
prejudice for failure to prosecute: delay caused by the plaintiff
himself and not his attorney; actual prejudice to the defendant;
or delay caused by intentional conduct.  *Id.*

**B.    Summary Judgment**

Summary judgment is appropriate when "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317,
322-23 (1986). *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075
(5th Cir. 1994). When assessing whether a dispute as to any
material fact exists, the Court considers "all of the evidence in
the record but refrains from making credibility determinations or
weighing the evidence." *Delta & Pine Land Co. v. Nationwide
Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All
reasonable inferences are drawn in favor of the nonmoving party,
but "unsupported allegations or affidavits setting forth
'ultimate or conclusory facts and conclusions of law' are
insufficient to either support or defeat a motion for summary
judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216
(5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party
will bear the burden of proof at trial, the moving party "must
come forward with evidence which would 'entitle it to a directed
verdict if the evidence went uncontroverted at trial.'" *Int'l
Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th
Cir. 1991). The nonmoving party can then defeat the motion by
either countering with sufficient evidence of its own, or
"showing that the moving party's evidence is so sheer that it may
not persuade the reasonable fact-finder to return a verdict in

favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

## III. DISCUSSION

### A. McCuiston's Release of Claims

1. <u>Standards governing a seaman's release of claims</u>

Seamen are the wards of admiralty law, and federal courts are duty-bound to jealously protect their rights. *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1160-61 (5th Cir. 1985) (citing *Garrett v. Moore-McCormack Co.*, 317 U.S. 239 (1942)). The Court is therefore "particularly vigilant" to guard against

overreaching in settlement agreements with seamen. *Id.* at 1161.
The proponent of a seaman's release of claims has the burden to
demonstrate that it was "executed freely, without deception or
coercion, and that it was made by the seaman with full
understanding of his rights." *Garrett*, 317 U.S. at 352. This
burden is often more difficult when the release is based on
inadequate consideration. *Id.* The burden is not insurmountable,
however, and a "district court lacks authority, especially where
the seaman testifies to complete satisfaction, to void the
agreement because the court thinks the seaman could have
negotiated a better deal." *Bass*, 749 F.2d at 1162.

The adequacy of consideration is relevant to the Court's
appraisal of whether the seaman had a full understanding of his
rights and of the consequences of the settlement agreement. *See*
*Garrett*, 317 U.S. at 248. Similarly, the Court may consider the
nature of the medical and legal advice available to the seaman in
determining whether he fully understood the agreement. *Garrett*,
317 U.S. at 248. If a medical condition has been incorrectly
diagnosed at the time of settlement, that mutual mistake may be a
basis for invalidating a seaman's release of claims. *See*
*Robertson v. Douglas S.S. Co.*, 510 F.2d 829, 835 (5th Cir. 1975);
*see also In re Cardinal Servs. Inc.*, 304 F. App'x 247, 254 (5th
Cir. 2008) (*per curiam*). On the other hand, a seaman "may have

to take his chances" that a properly diagnosed condition is "more serious and extensive than originally thought." *Robertson*, 510 F.2d at 835; *see also Durley v. Offshore Drilling Co.*, 288 F. App'x 188, 191 (5th Cir. 2008). Lastly, the Court is sensitive to whether the parties negotiated at arms-length and in good faith, and whether there is any appearance of fraud, deception, coercion or overreaching. *Borne v. A & P Boat Rentals No. 4, Inc.*, 780 F.2d 1254, 1256-57 (5th Cir. 1986).

    2.   <u>The validity of McCuiston's release of claims</u>

Because Tetra and Southern bear the ultimate burden of demonstrating the validity of McCuiston's release of claims, they must come forward with evidence that would entitle them to a directed verdict if the evidence went uncontroverted at trial. *Int'l Shortstop*, 939 F.2d at 1263-64. They have done so. The record indicates that McCuiston entered into the settlement agreement freely and without deception or coercion. McCuiston affirmed under oath that he was not under duress, that nobody was making him settle his claims, and that he was doing so because he wanted to. He also indicated that he was not under the influence of medication, narcotics or alcohol, and that he was of sound mind. McCuiston was informed that he was free to hire or consult with an attorney, and that he could potentially get more money if

14

he hired an attorney and filed a claim in court.  McCuiston
stated that he had consulted an attorney at one point, but he
chose not to hire the attorney and instead settle without
counsel.  McCuiston indicated that he was willing to complete the
settlement in order to avoid any prospect of litigation.

Furthermore, the record indicates that McCuiston understood
his rights and the implications of the release.  McCuiston
acknowledged that he had potential claims for maintenance an
cure, pain and suffering damages, economic losses and medical
expenses, and that these claims were contested.  McCuiston also
acknowledged that the practical implication of the settlement
agreement was to release Tetra and its principal contractor
(*i.e.*, Southern) from any and all future liability arising from
the accidents, and that he would not be entitled to any money for
any reason once the settlement was completed.  McCuiston was told
that he was giving up all of his rights even if his medical
conditions grew worse in the future.

Because Tetra and Southern have satisfied their burden at
summary judgement, McCuiston must come forward with sufficient
evidence that the release is invalid, or else show that
defendants' evidence could not persuade a reasonable fact-finder.
*Int'l Shortstop*, 939 F.2d at 1265.  The Court has already found
that defendants' evidence could persuade a reasonable fact-

finder, and McCuiston has not come forward with any evidence at all, or even responded to defendants' motion. Nor did McCuiston respond to Coastal's previous motion for summary judgment on the merits. (*See* R. Doc. 90.) On the record before the Court, McCuiston could at most point to his interjections during the deposition of Dr. Robert Davis to raise a possibility that his faculties were affected by medication at the time he executed the release of claims. But these statements are insufficient to send this case to a jury, even for a *pro se* litigant. First, they are unsworn and directly contradict McCuiston's contemporaneous sworn testimony that he was not under the influence of medication at the time he executed the release of claims. In any event, McCuiston has offered no basis for a reasonable jury to conclude that the types and amounts of medications he was allegedly taking could impair his mental faculties. There is no competent evidence that McCuiston was ever prescribed oxycodone. McCuiston's statements during the deposition of Dr. Robert Davis focus on his condition after receiving a tetanus shot on June 16, 2009. It appears that the only other medication offered to McCuiston on June 16, 2006 was over-the-counter Aleve. Although McCuiston was prescribed Toradol (an anti-inflammatory) on June 20, 2006, Coastal's physician, Dr. Robert Davis, testified that the tetanus shot and anti-inflammatory would not have impaired

his judgment or ability to understand the settlement agreement. McCuiston has not presented any evidence contradicting this conclusion, and his unsworn interjections during a third-party deposition are insufficient.

The Court recognizes that $2,000 is a relatively small sum. The amount is not, however, so low that the Court must conclude on the facts of this case that McCuiston lacked a complete understanding of his rights. McCuiston himself testified that his injuries were "resolved," that he was "no longer in need of medical treatment and that any disability [he] may have in the future or any disability [he] may have right now stems from medical problems not related to the incidents of June 14th, 15th or 16th . . . ." (R. Doc. 89, Ex. K at 8:3-13.) It also is uncontradicted that McCuiston suffered from significant prior back and leg injuries. Although the causation requirement for proving negligence under the Jones Act is "slight," McCusiton still may have anticipated problems litigating the amount of his damages as well as proving that an unwitnessed accident occurred.

The Court's conclusions are fully supported by case law. In *Bass*, a seaman suffered severe injuries when a forty-pound jack handle fell eighty feet and struck him on the head. 749 F.2d at 1156. The seaman settled his claims against his employer effectively for $32,000. 749 F.2d at 1156 n.3. The Fifth

Circuit found that the seaman executed his release of claims freely and knowingly and with a full understanding of his rights because (a) the agreement included warnings that the release of claims was complete; (b) the seaman testified that the provisions of the settlement were fully explained to him and that he willingly executed the agreement without reservation; and (c) the seaman did not allege that he executed the agreement with an imperfect understanding of his rights or the consequences of settlement. *Id.* at 1163. All three of these conditions hold in this case. Although the seaman in *Bass* was represented by counsel, nothing in *Bass* indicates that representation is a prerequisite for a valid release of claims.

In *Durden v. Exxon Corp.*, the Fifth Circuit upheld an unrepresented seaman's release of claims. 803 F.2d 845 (5th Cir. 1986). In *Durden*, a seaman injured his shoulder when he slipped and fell over the side of a grain barge. *Id*. at 847. He underwent three operations as a result of the fall and eventually settled his claims against his employer for $87,000 without the advice of counsel. *Id.* The Fifth Circuit held that the seaman's allegations that he was not advised by counsel and was depressed were insufficient to undermine the district court's conclusion that he fully understood his rights and the consequences of his actions. *Id.* at 488. The court observed that the seaman was

informed by the defendant's attorney that he was entitled to retain his own counsel, and that the seaman did not claim that he was coerced or deceived into settling his claims. *Id.* As in *Durden*, McCuiston does not claim that he was coerced or deceived into settling his claims, and he was informed that he was entitled to retain counsel. In fact, McCuiston did consult an attorney before executing the release of claims, but he chose to settle instead of hiring the attorney.

The Fifth Circuit's decision in *Halliburton v. Ocean Drilling & Explor. Co.* does not help McCuiston. 620 F.2d 444 (5th Cir. 1980) (*per curiam*). *Halliburton* found a genuine issue of material fact as to the validity of a seaman's release of claims because the record revealed that the seaman had been on a course of therapy requiring Phenaphen, Valium and Dalmane. *Id.* The seaman's physician submitted an affidavit stating that the drugs, when taken together, "have a potentiating, or greatly increased effect upon the patients' mental faculties, which the drugs, if ingested alone, would not have." *Id.* The physician also testified that a patient who had taken these drugs "would more than likely have impaired or diminished mental capacity . . . and certainly this would include the ability to understand, assess and fully appreciate the terms, results, and effects of a release of any claim involving the patient." *Id. Halliburton* is

distinguishable because McCuiston has submitted no competent evidence that his medications affected his judgment at the time of the settlement agreement. As already discussed, McCuiston's comments during the deposition of Dr. Robert Davis are insufficient, and therefore McCuiston may not avoid his release of claims on grounds of incapacity.

Lastly, McCuiston is not helped by the decisions in *Durley v. Offshore Drilling*. In *Durley*, a seaman was injured on an oil rig and diagnosed with severe bruising. *Durley v. Offshore Drilling*, 288 F. App'x at 189. The seaman then executed a release of claims for consideration of $3,000 without the assistance of counsel. The agreement, explained on the record, provided that the seaman released all claims that "may hereafter accrue to him, whether known or unknown, foreseen or unforeseen." *Id.* The agreement also stated that the seaman was fully aware that his condition could grow worse. *Id.* After executing the release, the seaman was diagnosed with torn ligaments in his knee and a herniated disc in his cervical spine. The Fifth Circuit reversed the district court's finding that the agreement was the product of mutual mistake. *Id.* at 190. Although the post-settlement medical diagnosis differed from prior diagnoses, this did not indicate mutual mistake because the seaman testified that he knew at the time he signed the release that he had injuries to

20

his knee and neck. *Id.* The Fifth Circuit remanded, however, for a determination of whether the seaman's allegations of economic duress, insufficient consideration, and lack of counsel warranted invalidating the release. *Id.* at 191-92. On remand, the district court invalidated the release on grounds that $3,000 was inadequate consideration for the seaman's serious knee and back injuries; the seaman was not represented by counsel during negotiations; and the defendants were aware of and took advantage of the seaman's serious financial troubles. *See Durley v. Offshore drilling Co.*, Civ. A. No. 06-5681, 2009 WL 799977, at *2 (E.D. La. Mar. 24, 2009). In this case, it appears that McCuiston's injuries are similar in kind to his undisclosed, preexisting injuries, and there is no indication that McCuiston has been diagnosed with entirely new injuries. Moreover, there is no indication in the record before the Court that McCuiston was subject to knowing and intentional economic duress. Accordingly, McCuiston may not avoid his release of claims on grounds of mutual mistake or duress.

**B.   Failure to Prosecute**

Because the Court finds that McCuiston's release of claims is enforceable as to Tetra and Southern, the Court need not and does not reach defendants' motion to dismiss for failure to

prosecute.

**IV.  CONCLUSION**

For the reasons stated, Tetra's and Southern's motion for summary judgment is GRANTED.

New Orleans, Louisiana, this 15th day of January, 2010.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE